## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| ROSS DEAMBROGIO, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE FRESH MARKET, INC., RAY BERRY, RICK ANICETTI, MICHAEL D. CASEY, JEFFREY NAYLOR, RICHARD NOLL, BOB SASSER, ROBERT K. SHEARER, MICHAEL TUCCI, STEVEN TANGER, and JANE THOMPSON,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(e), 14(d)(4), AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Ross DeAmbrogio ("Plaintiff"), by his undersigned attorneys, for this Class Action Complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of his counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and the public stockholders of The Fresh Market, Inc. ("Fresh Market" or the "Company") against Fresh Market and the members of its board of directors to enjoin a proposed acquisition of Fresh Market by entities owned and controlled by private equity firm Apollo Global Management, LLC (the "Proposed Transaction") that was announced on March 14, 2016.  In pursuing the Proposed Transaction, each of the Defendants has violated the above-referenced sections of the Exchange Act.

2.      On March 14, 2016, Fresh Market entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which the Company's stockholders will receive $28.50 per share (the "Merger Consideration") by way of an all-cash tender offer (the "Tender Offer").

3.      The Proposed Transaction is a going private transaction whereby Apollo Global Management, LLC ("Apollo"), a publicly traded private equity firm, will acquire Fresh Market for inadequate consideration.

4.      As discussed below, the Proposed Transaction is the product of a flawed process and deprives Fresh Market's public stockholders of the ability to participate in the Company's long-term prospects.

5.      Furthermore, the flawed sale process was tainted from the outset due to Defendant Ray Berry's ("Berry") and his son Brett Berry's prior back channeling with Apollo.  Defendant Berry and his family, who collectively own approximately 9.8% of the outstanding common stock of the Company, were able to initiate the current Proposed Transaction in private conversations with Apollo, unknown to the rest of the Company Board or management, well before the sale process had even begun.

6.      Additionally, Defendant Berry and Apollo shrewdly calculated the most profitable time for them to strike; in the midst of a leadership change of Fresh Market before the Company's new strategic plan was fully formed.  By blindsiding the Board through prior negotiations with Defendant Berry, Apollo was able to influence the sale process from the outset. Notably, they were the only interested party that was afforded the opportunity to speak with Defendant Berry and his family regarding equity rollovers.  Furthermore, Apollo was able to cause the Board to completely abandon its plan for a second round of bidding in favor of its own

offer, thus shutting out several competing bidders who may have offered a higher valuation for the Company.

7.     The Board also failed in their oversight of selecting a financial advisor.  J.P. Morgan Securities, LLC ("J.P. Morgan"), the firm retained as Fresh Market's financial advisor for the sale process leading up to the Proposed Transaction, has done over $116 million worth of business with Apollo in the past two years, completely negating any semblance of independence and unbiasedness they purported to have in delivering their fairness opinion to Fresh Market in the Proposed Transaction.  Despite these facts, the Board inexplicably deemed J.P. Morgan to be unbiased enough to render a fairness opinion.

8.     Defendants have now asked Fresh Market's stockholders to support the Proposed Transaction and tender their shares by filing   a materially incomplete and misleading recommendation statement on Schedule 14D-9 with the Securities and Exchange Commission (the "SEC") on March 25, 2016 (the "Recommendation Statement" or "14D-9").  Notably, the Recommendation Statement fails to disclose all material information necessary for Fresh Market stockholders to make an informed decision regarding the Proposed Transaction, and these omissions need to be remedied in order to make existing statements in the Recommendation Statement not materially misleading.  Specifically, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Transaction; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" provided by Fresh Market's financial advisor, J.P. Morgan; and (3) Fresh Market's financial projections and extrapolated projections relied upon by J.P. Morgan.

9.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer and consummating the Proposed Transaction unless and until the Exchange Act violations discussed below are remedied.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 14(d), 14(e), and 20(a) of the Exchange Act, 15 U.S.C. §78n.  The Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

11.     This Court has personal jurisdiction over all of the Defendants because Fresh Market is a Delaware corporation and the Individual Defendants are either present in this District for jurisdictional purposes or have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Further, the Individual Defendants approved the Company's Amended and Restated Bylaws, which designate this Court as the sole and exclusive forum for actions of this nature.

12.     Venue is proper under Section 27 of the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. §1391, because Fresh Market is incorporated in this District and each Defendant transacted business in this District.

## PARTIES

13.     Plaintiff has been, at all times relevant hereto, a Fresh Market stockholder. Plaintiff is a citizen of New Jersey.

14.     Defendant Fresh Market is a Delaware corporation that maintains its principal executive offices at 628 Green Valley Road, Suite 500, Greensboro, North Carolina 27408.  The Company's securities trade on the NasdaqGS under the symbol "TFM."  Fresh Market operates

as a specialty grocery retailer in the United States and offers various food products for sale at its locations.

15.    Defendant Berry has been a Director of Fresh Market at all relevant times and serves as the Chairman of the Board.  Berry founded the Company in 1981 and has served as Chairman since that time.  In addition, Berry served as the Company's Chief Executive Officer ("CEO") from 1981 until 2007.  Berry is a citizen of Florida.

16.    Defendant Rick Anicetti ("Anicetti") has been a Director of Fresh Market at all relevant times and has served as the President and CEO of the Company since September 2015. Anicetti is a citizen of North Carolina.

17.    Defendant Michael Casey ("Casey") has been a Director of Fresh Market at all relevant times.  Casey is a citizen of Georgia.

18.    Defendant Jeffrey Naylor ("Naylor") has been a Director of Fresh Market at all relevant times.  Naylor is a citizen of Massachusetts.

19.    Defendant Richard Noll ("Noll") has been a Director of Fresh Market at all relevant times.  Noll is a citizen of North Carolina.

20.    Defendant Bob Sasser ("Sasser") has been a Director of Fresh Market at all relevant times.  Sasser is a citizen of Virginia.

21.    Defendant Robert Shearer ("Shearer") has been a Director of Fresh Market at all relevant times.  Shearer is a citizen of North Carolina.

22.    Defendant Michael Tucci ("Tucci") has been a Director of Fresh Market at all relevant times.  Tucci is a citizen of New York.

23.    Defendant Steven Tanger ("Tanger") has been a Director of Fresh Market at all relevant times.  Tanger is a citizen of New York.

24.     Defendant Jane Thompson ("Thompson") has been a Director of Fresh Market at all relevant times.  Thompson is a citizen of Illinois.

25.     The defendants named above in paragraphs 15-24 are sometimes collectively referred to herein as the "Individual Defendants" and/or the "Board."

## FACTUAL ALLEGATIONS

### *Background of the Company*

26.     Fresh Market operates as a specialty grocery retailer in the United States.  The Company offers various food products that focus on perishable product categories, including meat, seafood, produce, deli, bakery, floral, sushi, and prepared foods; and on non-perishable product categories, such as traditional grocery, frozen, and dairy products, as well as bulk, coffee and candy, beer and wine, and health and beauty products.  As of September 24, 2015, it operated 177 stores in 27 states.  The Company was founded in 1982 and is headquartered in Greensboro, North Carolina.

27.     Over the past year, the Company has exhibited strong operational execution and financial performance across the businesses in which it operates.  For example, on November 19, 2015, Fresh Market released its Q3 2015 financial results.  Notably, the Company saw a sales increase of 3.3% year-on-year for a total sales figure of $433.1 million.  Furthermore, gross profit increased 4.3% or $5.9 million year-on-year, with a related increase in the Company's gross margin rate of 30 basis points to 33.2%.  Additionally, the Company opened six new stores in this period, including stores in Florida, South Carolina, Georgia, Alabama and Connecticut, increasing the Company footprint as of October 25, 2015 to 180 stores in 27 states.

28.     Defendant Anicetti, speaking on these results, noted that the future prospects of the Company looked positive, saying, "The Fresh Market is a unique brand with enormous untapped potential…"

29.     Fresh Market's strong recent performance is not an anomaly, but rather part of a trend of upward financial mobility.  On August 20, 2015 the Company released its Q2 2015 financial results which showcased a net sales increase of 4.7% year-on-year.  Additionally, the Company's gross profits increased 3.7% year-on-year and the Company's gross margin rate increased 30 basis points from the same quarter in 2014.  Also of note was that the Company opened six new stores with locations in Texas, North Carolina, Georgia, Louisiana and New York, bringing the Company's total footprint to 174 stores in 27 states.  Speaking positively on these results, Interim CEO Sean Crane ("Crane") stated that the Company's financial health was "sound".

30.     Looking further back, Fresh Market reported a net sales increase of 7.2% in the first quarter of 2015, as stated in the Company's May 21, 2015 press release announcing 2015 Q1 financials.  Additional positive results from the period included a gross profit increase of 8.4% or $12.4 million compared to Q4 of 2014 and a 40 basis point jump in gross margin year-on-year.  Additionally, the Company exhibited further growth in this period, opening two new stores in Missouri.

31.     Despite the consistent increase in net income, gross profits, and gross margins throughout fiscal 2015, the Proposed Transaction seeks to deny the Plaintiff and other public stockholders of Fresh Market the ability to reap the benefit on their investments in the Company.

*The Flawed Process Leading to the Proposed Transaction*

32.     As revealed by the Recommendation Statement, the Proposed Transaction is the product of a flawed bidding process which allowed for Defendant Berry and Apollo to circumvent the entire process implemented by the Board of Directors and forced an undervalued transaction to fruition.

33.     On September 1, 2015, the Company announced that it had named Defendant Anicetti as the President and CEO of the Company, and announced that it had elected Anicetti to the Board.  Anicetti immediately began working with the rest of Company management on a long term strategy to guide the Company to improved performance.

34.     One month later, on October 1, 2015, the Board received an unsolicited preliminary non-binding indication of interest from Apollo, on behalf of equity funds managed by it, proposing to acquire the Company in an all-cash transaction for a purchase price of $30.00 per share.  Unbeknownst to the Board at the time, Apollo had previously discussed this matter with Defendant Berry and his son Brett Berry, who collectively owned approximately 9.8% of the outstanding common stock of the Company.  The Apollo letter also indicated that the Berrys would roll over their shares into the new company and would be working in an exclusive partnership in connection with a potential acquisition of the Company.  Berry failed to advise the Board of his discussions with Apollo prior to the time it received Apollo's offer.

35.     On October 5, 2015, Scott Duggan, the Company's Senior Vice President – General Counsel, contacted Defendant Berry to clarify Defendant Berry's relationship with Apollo and his interactions with Apollo prior to Apollo's submission of its October 1, 2015 proposal.  Defendant Berry, for the first time, informed Mr. Duggan that he had engaged in three separate conversations with a representative of Apollo regarding a potential transaction.  The

first conversation had taken place a few months prior to Apollo's letter when Andrew Jhawar, senior partner with Apollo, had contacted Defendant Berry to have a general discussion about the Company and the food retail industry. The second conversation had taken place a few weeks prior to Apollo submitting its October 1, 2015 proposal and again involved discussions with Mr. Jhawar wherein Mr. Jhawar indicated to Defendant Berry that he was interested in the food retail industry and the Company and had asked Defendant Berry if he would be interested in participating in a transaction through an equity rollover. The third conversation took place shortly before Apollo's letter, and was a courtesy call during which Defendant Berry was informed that Apollo would be sending the letter.

36.     On October 16, 2015, before the Board had conveyed their response to Apollo, a news outlet published an article speculating that Defendant Berry was exploring a bid to take the Company private with the help of a private equity firm and that Apollo had agreed to work with Defendant Berry on a potential offer to acquire Fresh Market.

37.     The Proposed Transaction was thus the product of a conflicted sale process in which Defendant Berry was able to back channel with Apollo before the process even began, giving Apollo an unfair advantage and setting up a process by which it was impossible for other interested parties to catchup.

38.     Notably, despite the numerous meetings of the Board, Special Transaction Committee, and J.P. Morgan, Apollo was able to completely circumvent the original plan for a second round of bidding, instead forcing the Company to speed up its timeframe to better accommodate its own interests, while providing other interested parties with insufficient time to complete their diligence.

39.     Clearly, such actions were influenced by the prior backroom dealing between Defendant Berry, members of his family, and Apollo.  As is admitted in the Recommendation Statement, several meetings occurred between these parties before the rest of the Board and the management were even aware that Apollo was interested in the Company.

40.     Further exacerbating matters was that Apollo and Defendant Berry's actions were calculated to catch the Company off guard during a transition period between CEO leadership, and when Fresh Market's new strategic plan was yet to be fully developed.  Such timing was not coincidental, and is most likely the product of Defendant Berry attempting to maximize his own and his family's profits at the expense of the Company and public stockholders of Fresh Market.

41.     Despite the fact that Defendant Berry was purportedly recused after the sale process had begun, the Board completely failed to insulate their decision making from the effects of his back channeling.  For example, Apollo was continually given preferential treatment throughout the process, including the Board's decision to abandon entirely the framework it had maintained for a second round of bidding and thus not allowing several interested parties the ability to submit bids, which very well may have pushed the valuation of Fresh Market upwards.

42.     Further, the Board decided to prohibit all other participants in the sale process from speaking with Berry regarding the rollover of his shares without the Company's express permission, despite the fact that this was a central issue to all interested parties and Apollo had already spoken with Berry about this issue, which provided Apollo with a significant advantage over other interested bidders.

43.     Additionally, the confidentiality agreements the Board required all interested parties to enter into prohibited them from having discussions with any potential co-bidders in connection with a potential acquisition of the Company, contacting any potential sources of debt

or equity financing for a potential acquisition of the Company (including with respect to an equity rollover) or entering into any exclusive financing arrangements, without the Company's express permission.  These restrictions heavily favored Apollo, a private equity firm which was able to finance the deal via equity funds it manages, and thus it did not have to contact outside sources for equity financing like other interested parties.

44.     In addition to Defendant Berry's inappropriate conduct, the Board failed to properly question J.P. Morgan's independence regarding its relationship with Apollo.  Notably, the Recommendation Statement reveals that, during the two year period up to January 31, 2016, the aggregate fees received by J.P. Morgan from Apollo were *in excess of $116 million*.  In Contrast, J.P. Morgan's aggregate of fees received by the Fresh Market during the same period was $204,372; it is obvious which company's business is more important to J.P. Morgan.

45.     It goes without saying that $116 million over two years is an incredibly large amount of revenue flow from one client, and it is clear from such an amount that Apollo is one of J.P. Morgan's most valuable customers.  Such undue influence was completely glossed over and/or ignored by the Special Transaction Committee and the larger Board during the sale process.

46.     Taken together, the undue influence and impropriety of Defendant Berry's relationship with Apollo, and the improper relationship and undue influence of Apollo and J.P. Morgan, combine to create a situation in which Apollo was designed, from the outset, to be the eventual acquiring party.

47.     The sale process was little more than a hamstrung show, orchestrated by Defendant Berry and Apollo, overseen by a compromised and biased financial advisor, to ensure the Proposed Transaction played out as planned, thus depriving Fresh Market public

stockholders of the opportunity to participate in the growth of the Company in which they have loyally invested.

***The Inadequate Merger Consideration***

48.     The Proposed Transaction values Fresh Market stock at $28.50 per share.   The Company's extraordinary growth, healthy gross margins, and analyst expectations establish the inadequacy of the Merger Consideration.

49.     As discussed herein, the current fiscal year has been one of great success for Fresh Market.   The Company has posted increases in net income, gross profits, and gross margins in every financial report released in 2015.

50.     Significantly, the Company has traded significantly higher than the merger valuation recently, hitting a high valuation point of $41.70 within the last year.   Significantly, such a valuation is over 46% greater than the Merger Consideration.

51.     Additionally, a group of twenty *Yahoo! Finance* analysts have valued the Company as high as $44.00 per share recently, a valuation over 54% greater than that considered in the Proposed Transaction.

52.     Pursuant to the terms of the Merger Agreement, at the effective time, all outstanding Company options and restricted shares will be deemed to be fully vested and converted into the right to receive the Merger Consideration.   According to Fresh Market's Recommendation Statement, collectively, the Company's senior executive officers and directors beneficially own over $29 million in company options and other restricted units.   As a result of the Proposed Transaction, these individuals will receive immediate liquidity for their currently illiquid stock holdings.

53.     In addition, several Company insiders will receive large cash payouts when the Proposed Transaction is consummated due to change-in-control or "golden parachute" agreements they have with the Company.   Upon a change-in-control resulting in their termination (of which the Proposed Transaction qualifies), eligible Company insiders collectively stand to receive over $6.4 million, further benefits which will not be shared amongst the public stockholders of Fresh Market.

54.     Furthermore, according to the 14D-9, Defendant Berry and his brother, Brett Berry, who collectively own 9.8% of the outstanding shares of the Company will be rolling over their stake in the Company with Apollo, allowing them the opportunity to invest in the future of the Company that has seen consistent growth throughout 2015.   Berry, recognizing the Company's long-term growth prospects, was eager to keep his equity interest in the post-merger Company.   This is an opportunity not afforded to Plaintiff or other public stockholders of Fresh Market.

55.     Accordingly, while Berry and other insiders will personally benefit from the Proposed Transaction, Plaintiff and the Class will be cashed out for inadequate consideration and will be unable to share in these benefits.

***The False and Misleading Recommendation Statement***

56.     Defendants have now asked Fresh Market stockholders to accept the inadequate Merger Consideration by tendering their shares in the Tender Offer based upon materially incomplete and misleading information in the 14D-9.   It is critical that stockholders receive complete and accurate information about the Proposed Transaction prior to deciding whether to tender their shares.   To date, however, Defendants have failed to provide Fresh Market stockholders with such information.   As set forth in more detail below, the Recommendation

Statement omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Transaction; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" of J.P. Morgan; and (3) Fresh Market's financial projections, relied upon by J.P. Morgan.

> **1.    The Recommendation Statement fails to adequately describe the sale process and the conflicts of interest infecting it.**

57.    The Recommendation Statement fails to fully and fairly disclose certain material information concerning the process leading to the Proposed Transaction and the conflicts of interest that infected it.

58.    First, the 14D-9 fails to disclose the reasoning behind Defendant Berry's failure to disclose his discussions with Apollo, considering there were multiple discussions over several months, until after Apollo made its October 1, 2015 proposal, and only after Defendant Berry was approached by Duggan regarding his relationship with Apollo.

59.    The 14D-9 also fails to disclose the rationale for the Board's decision to prohibit every interested party from speaking with Individual Defendant Berry regarding an equity rollover of his shares without the Company's express permission, when this was a central issue to all interested parties and Apollo had already spoken with Berry about this issue, which provided Apollo with a significant advantage over other interested bidders.

60.    The failure to disclose the above-referenced information renders the statement in the 14D-9 that one of the reasons for the Board's recommendation of the Proposed Transaction was the "lengthy and open sale process conducted by TFM prior to entering into the Merger Agreement" materially misleading, because without explanation on the two issues above stockholders are unable to determine whether the process was truly an "open sale process" or

was improperly steered towards a deal with Apollo as a result of Berry's pre-existing relationship with Apollo.

61.     With respect to J.P. Morgan's relationship with Apollo, the 14D-9 states that on March 11, 2016, the same day that the Board voted to approve the Proposed Transaction, J.P. Morgan suddenly "provided updated disclosure to the Board with respect to its relationship with Apollo…"   The 14D-9 states that the Board had previously considered J.P. Morgan's relationship with Apollo during its meeting on October 15, 2015, and it is unclear what "updated" information suddenly surfaced that J.P. Morgan felt the need to disclose on March 11, 2016, right before the Board vote.  Stockholders must be provided with the substance of J.P. Morgan's "updated disclosure."   Because of the central role J.P. Morgan played in the sale process and the determination that the Merger Consideration is fair, it is critical that Fresh Market stockholders receive this material information, which will enable them to assess whether J.P. Morgan was conflicted.  The failure to disclose this information renders the statement that J.P. Morgan was "independent" materially incomplete and misleading.

62.     Further, the 14D-9 states that the Company was "permitted to initiate, solicit, facilitate and encourage potential takeover proposals from third parties," up until April 2, 2016, and on April 4, 2016, the Company filed Amendment No. 2 to the 14D-9, which merely states that the "go-shop" period expired and "TFM did *not receive* any potential takeover proposals from third parties during the 'go-shop' period."   However, Amendment No. 2 fails to disclose whether the Company actually exercised its right to "initiate, solicit, facilitate and encourage potential takeover proposal from third parties," and therefore the above-referenced statements in the 14D-9 and Amendment No. 2 are materially incomplete and misleading.  Indeed, while Defendants tout the "go-shop" provision as one of their reasons for recommending the Proposed

Transaction, it is unclear whether the Company ever bothered to actually exercise its rights pursuant to the "go-shop" provision.  Stockholders would undoubtedly find this information material.

          **2.**      **The Recommendation Statement fails to disclose key financial metrics underlying J.P. Morgan's analyses.**

63.      In the Recommendation Statement, J.P. Morgan describes its fairness opinion and the various valuation analyses it performed to render its opinion.   However, J.P. Morgan's description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.   Without this information, one cannot determine whether or not the implied per share equity values set forth in the 14D-9 accurately reflect the true value of Fresh Market shares.

64.      With respect to J.P. Morgan's *Public Trading Multiples* analysis, the 14D-9 fails to disclose:

    a)  The basis for J.P. Morgan's decision to apply a multiple reference range of 4.5x-8.0x for the FV to estimated EBITDA ratios for 2016E, significantly below the multiples observed for the selected companies;

    b)  The basis for J.P. Morgan's decision to apply a multiple reference range of 12.0x-20.0x for the P/E ratios for 2016E, significantly below the multiples observed for the selected companies; and

    c)  The basis for J.P. Morgan's decision to apply the FV to estimated EBITDA ratios to four sets of projections provided by Company management, but to apply the P/E ratio range to **only** the November 17 Management Case.  This information is material, as the decision to apply the FV to estimated EBITDA ratios to the significantly lower "Additional Scenario" Forecasts resulted in a significantly

lower implied price per share reference range, and the disparate use of the two sets of multiples are indicative of an analysis that was intentionally manipulated by utilizing lower projections in order to make the Merger Consideration appear fair.

65.     The omission of the above-referenced information renders the implied per share equity values in this section of the 14D-9 and the statements that the Merger Consideration is "fair" materially misleading because stockholders have no way of determining whether the range of multiples J.P. Morgan applied were reasonable when compared to the multiples observed for the selected companies, and thus have no way of determining whether the implied per share equity reference ranges accurately reflect the value of their shares.

66.     With respect to J.P. Morgan's *Selected Transaction Analysis*, the 14D-9 fails to disclose:

a)  The criteria J.P. Morgan used to select the five transactions it relied upon for this analysis, including the equity values of the selected transactions, and whether any transactions were considered but ultimately excluded from this analysis.  This information is material because J.P. Morgan selected three fairly recent transactions but then included two extremely old transactions from ten years ago, which is indicative of an analysis that was intentionally manipulated by utilizing old and irrelevant transactions that had lower multiples in order to make the Merger Consideration appear fair; and

b)  The multiples observed for each of the five transactions utilized, which is material information that a reasonable stockholder would consider important in determining whether or not to tender their shares.  The failure to disclose the

multiples is particularly egregious here, because the 14D-9 fails to provide even the high/low range, mean and median of the observed multiples, even though such information was disclosed in the immediately preceding *Public Trading Multiples Analysis*.  It is thus clear that Defendants are fully aware that the observed multiples for each transaction should be disclosed, but that they decided to hide this information from stockholders because they do not want stockholders to be able to determine whether the multiple reference range J.P. Morgan selected was fair and reasonable.

67.     The omission of this information from the 14D-9 renders the implied per share equity values in this section of the 14D-9 and the statements that the consideration is "fair" to stockholders materially misleading, because stockholders have no way of determining whether the transactions selected and the multiple reference range J.P. Morgan applied was reasonable when compared to the multiples observed for the selected transactions, and thus have no way of determining whether the implied per share equity reference range accurately reflects the value of their shares.

68.     With respect to J.P. Morgan's *Illustrative Discounted Cash Flow Analysis* ("DCF Analysis"), the 14D-9 fails to disclose:

a) The specific inputs and assumptions used to determine the discount rate range of 9.0% to 10.0% used in this analysis;

b) The basis for the implied perpetuity growth rate range of only 1.5%-2.5%; and

c) The assumptions underlying J.P. Morgan's estimate of the Company's weighted average cost of capital.

69.     These inputs and assumptions have a significant impact on the ultimate implied per share equity values that J.P. Morgan arrived at for this analysis.   The omission of this information renders the implied per share equity values in this section of the 14D-9 and the statements that the Merger Consideration is "fair" to stockholders materially misleading, because stockholders have no way of determining whether the assumptions J.P. Morgan made were reasonable, and thus have no way of determining whether the implied per share equity reference ranges accurately reflect the value of their shares.

### 3.     The Recommendation Statement fails to disclose certain key financial projections underlying J.P. Morgan's analyses.

70.     The Recommendation Statement also fails to disclose key information regarding certain projections prepared by TFM management and provided to, and relied upon, by J.P. Morgan.  A stockholder's decision to accept or reject the proposed transaction rests on knowing management's projection of free cash flow and is improved by understanding how specific factors (i.e., the disclosed line items described below) affected unlevered cash flow.   The definition of unlevered free cash flow can vary depending on the financial advisor and the subject company; therefore, it is important to understand the individual components comprising the calculation of unlevered free cash flow and the resulting impact on the value indications from the DCF Analysis.

71.     Here, the Recommendation Statement states that "unlevered free cash flow represents unlevered net operating profit after tax, adjusted for depreciation, capital expenditures, changes in net working capital and *certain other expenses as applicable*."   (Emphasis added.) Thus, the Recommendation Statement should disclose:

    a)  EBIT;

    b)  Depreciation and amortization;

c) Stock-based compensation expense;

d) Capital expenditures; and

e) Changes in working capital.

72.     These projections were used by J.P. Morgan in its fairness analyses, including in connection with its DCF Analysis.  The omission of this information renders the summary of the DCF Analysis and the Company's free cash flow projections in the 14D-9 materially incomplete and misleading because these critical line items significantly impact the calculation and significance of the free cash flow numbers.  Without the omitted projections, the 14D-9 creates the misleading impression that JPMorgan's DCF Analysis is reliable and supports the fairness of the Merger Consideration.

73.     Further, the Recommendation Statement fails to clarify whether the "certain sensitivity information regarding different assumptions as to revenue and gross margin" the Board received in December 2015 was the same sensitivity information that was utilized to prepare the Additional Scenario Information disclosed in the 14D-9.  The failure to provide this information renders the discussion of the "sensitivity information" on page 46 of the 14D-9 materially incomplete and misleading.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the other public stockholders of Fresh Market who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

75.     This action is properly maintainable as a class action.

76.     The Class is so numerous that joinder of all members is impracticable.  As of March 9, 2016, there were more than 47 million shares of Fresh Market common stock

outstanding, on information and belief that are held by hundreds to thousands of individuals and entities.  Members of the Class are dispersed throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

77.     Questions of law and fact exist that are common to the Class and predominate over any questions affecting only individual members, including, among others:

(a)     whether the Defendants have violated Sections 14(d)(4) , 14(e) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and

(b)     whether Plaintiff and the other members of the Class would be irreparably harmed if the Proposed Transaction complained of herein is consummated as currently contemplated.

78.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.   Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

79.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

80.     Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

81.     A class action is superior to other available methods for fairly and effectively adjudicating the controversy.

## COUNT I

### Claim for Violations of Section 14(e) of the Exchange Act
### <u>Against All Defendants</u>

82.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

83.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

84.     As discussed above, Fresh Market filed and delivered the Recommendation Statement to its stockholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

85.     During the relevant time period, Defendants disseminated the false and misleading Recommendation Statement above.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.     The Recommendation Statement was prepared, reviewed and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants and the Company's financial advisor.

87.     In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

88.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

89.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

90.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT II

### Claim for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9) Against All Defendants

91.      Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

92.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

93.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.  Specifically, Section 14(d)(4) provides that:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

94.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

95.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

96.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

97.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

98.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT III

### Claim for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

99.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

100.    The Individual Defendants acted as controlling persons of Fresh Market within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Fresh Market, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

101.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

103.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The

Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

104.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

105.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.     Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from closing the Tender Offer or otherwise consummating the Proposed Transaction, unless and until the Company discloses the material information identified above which has been omitted from the Recommendation Statement;

C.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  April 7, 2016                        **FARUQI & FARUQI, LLP**

                                             By: */s/ James R. Banko*
                                             James R. Banko (#4518)
                                             Derrick B. Farrell (#5747)
                                             20 Montchanin Road, Suite 145
                                             Wilmington, DE 19807
                                             Tel: (302) 482-3182
                                             Email: jbanko@faruqilaw.com
                                             Email: dfarrell@faruqilaw.com

                                             *Attorneys for Plaintiff*


**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
685 Third Ave., 26th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: jmonteverde@faruqilaw.com


*Attorneys for Plaintiff*